# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

# NO. 2022 CA 1288

# DENISA JOSHUA, et al.

# VERSUS

# COMMUNITY CARE CENTER OF HERITAGE HOUSE, LLC, et al.

*Judgment Rendered:* SEP 05 2023

\* \* \* \* \* \* \* \*

**Appealed from the**
**19th Judicial District Court**
**In and for the Parish of East Baton Rouge**
**State of Louisiana**
**Case No. 678234**

**The Honorable Trudy M. White, Judge Presiding**

\* \* \* \* \* \* \* \*

| | |
|---|---|
| William C. Rowe, Jr.<br>Joseph S. Manning<br>Baton Rouge, LA | Attorneys for Appellants,<br>Louisiana Patient's Compensation<br>Fund and Louisiana Patient's<br>Compensation Fund Oversight Board |
| David L. Bateman<br>J. Michael McDonald<br>Baton Rouge, LA | Attorneys for Appellee, Denisa<br>Joshua, Individually and on Behalf of<br>the Estate of Deloris Simon |
| Vincent J. Sotile, Jr.<br>Prairieville, LA | |
| Eric John Miller<br>Alexandria, LA | Attorney for Appellee, Baton Rouge<br>Heritage House, LLC, et al. |

\* \* \* \* \* \* \* \*

**BEFORE: GUIDRY, C.J., WOLFE AND MILLER, JJ.**

**WOLFE, J.**

In this medical malpractice action, defendants/appellants, the Louisiana Patient's Compensation Fund and the Louisiana Patient's Compensation Fund Oversight Board ("the PCF"), appeal from an adverse judgment rendered on December 3, 2021. Subsequent to a jury trial, the judgment awarded $400,000.00 in damages, plus all costs, to plaintiff/appellee, Denisa Joshua ("Ms. Joshua"), individually, and on behalf of the estate of Deloris Simon ("plaintiff"). This judgment was rendered for both the survival action and wrongful death claims Ms. Joshua filed against the PCF following the death of her mother, Deloris Simon ("Mrs. Simon"). For the reasons set forth herein, we affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

In 2002, Mrs. Simon became a resident at the Baton Rouge Heritage House ("Heritage House"), a nursing home facility. She had a prior medical history of a stroke, muscle weakness, lack of coordination, as well as mental illness including manic disorder and schizophrenia. In July 2013, Mrs. Simon experienced a choking incident while eating a meal in the Heritage House dining room. As a result, a swallow study was ordered for her. Based on the results, it was determined Mrs. Simon had difficulty swallowing and was placed on a diet of only pureed food, which remained in effect until her death. Further, during her stay at Heritage House, Mrs. Simon was confined to a wheelchair and could not get in or out of her bed without nursing home staff assistance.

Antoinette Hoffman ("Hoffman"), a CNA with nearly a decade of experience and employment at multiple nursing homes, became employed at Heritage House on January 18, 2017. On the evening of January 21, 2017, Hoffman, who was still in training, was tasked with distributing evening snacks to the Heritage House residents and, inadvertently, swapped some intended items: a sandwich was provided to Mrs. Simon and a cup of Jell-O to Mrs. Simon's

roommate. The snacks were allegedly not marked with appropriate identification and Hoffman claimed to receive no training in the distribution of the evening snacks to the Heritage House residents, although a resident's dietary restrictions are noted on the identification board behind each resident's bed. Nevertheless, Hoffman distributed the incorrect snacks, left Mrs. Simon's room, and went on break. Several minutes later, Phyllis Mitchell, another Certified Nursing Assistant at Heritage House, entered Mrs. Simon's room for a final round of her shift and found Mrs. Simon unresponsive. Mitchell notified her supervising nurse, Kierra Benoit, who came to the room, likewise found Mrs. Simon to be unresponsive, and ordered a "code blue," an internal code signifying the beginning of life resuscitating measures. Acadian Ambulance was notified of the emergency and, upon the EMT's arrival, found Heritage House personnel attempting to resuscitate Mrs. Simon through chest compressions. It was reported to Acadian Ambulance personnel that Mrs. Simon "was given a sandwich and patient has difficulty swallowing, is not supposed to have normal food[.]" The responding EMT quickly realized Mrs. Simon choked and, despite attempts to resuscitate her, ultimately determined Mrs. Simon died. At that point, according to Acadian Ambulance's protocol, the emergency department at the closest hospital, Our Lady of the Lake in Baton Rouge, was contacted, and the ER physician advised of the termination of efforts to revive Mrs. Simon.

Following Mrs. Simon's death, Heritage House notified the East Baton Parish Coroner's Office; however, when the investigator arrived that evening, the Heritage House staff failed to disclose that Mrs. Simon was fed a sandwich in violation of her dietary restrictions. Additionally, the staff did not disclose the "copious" amount of food in Mrs. Simon's throat upon the EMT's arrival. Based on the information provided, the Coroner, Dr. William Clark, stated that "nothing seemed abnormal" regarding Mrs. Simon's death, which was initially classified in

3

her death certificate as "natural" and due to cardiovascular disease. However, when the Coroner's Office later received the records from Acadian Ambulance concerning Mrs. Simon's death, the Coroner's Office updated its report, and issued a second death certificate, classifying Mrs. Simon's death as "accidental" and due to "choking." Furthermore, Heritage House failed to follow applicable state and federal administrative guidelines in reporting Mrs. Simon's death to the Louisiana Department of Health, as well as its own internal policies regarding deaths due to unknown causes. As a result, Heritage House paid a civil fine of $7,247.00 for its failure to appropriately and timely report Mrs. Simon's death.

In January 2019, plaintiff filed a Petition for Approval of Settlement of Medical Malpractice Claim and Reservation to Proceed Against the Louisiana Patient's Compensation Fund. She had previously agreed to settle with Heritage House in the amount of $95,000.00, which, pursuant to Louisiana Revised Statute 40:1231.4(C)(1)[1], needed to be approved by the trial court. In her petition, Ms. Joshua reserved her rights to proceed against the PCF for damages in excess of $100,000.00. On May 15, 2019, the trial court granted approval of plaintiff's settlement with Heritage House.[2] At the conclusion of trial in November 2021, the jury issued a verdict finding Heritage House breached the standard of care, causing Mrs. Simon's death, and awarded plaintiff $250,000.00 for her survival action claim, and $500,000.00 for her wrongful death claim. These amounts were

---

[1] Louisiana Revised Statute 40:1231.4(C)(1) states, "[i]f the insurer of a health care provider or a self-insured health care provider has agreed to settle its liability on a claim against its insured and claimant is demanding an amount in excess thereof from the patient's compensation fund for a complete and final release, then the following procedure must be followed: (1) [a] petition shall be filed by the claimant with the court in which the action is pending against the health care provider, if none is pending in the parish where plaintiff or defendant is domiciled seeking (a) approval of an agreed settlement, if any, and/or (b) demanding payment from the patient's compensation fund."

[2] Per the May 15, 2019 judgment approving plaintiff's settlement, Heritage House remained a nominal defendant in the litigation while plaintiff sought additional damages from the PCF.

reduced to one award of $400,000.00 pursuant to the medical malpractice damages cap.[3] It is from this judgment that the PCF appeals, seeking review from this court.

## ASSIGNMENTS OF ERROR

The PCF assigns the following as error:

1. The trial judge erred in preventing the PCF from putting on a defense of a gross negligence standard in a medical malpractice action according to the Emergency Powers Act. The judge denied a pre-trial [m]otion aimed at this issue, and the judge further denied requests for jury instructions on this area of law.

2. The trial court abused its discretion in preventing the PCF from introducing in any format whatsoever pre-trial stipulations that were agreed upon by counsel, written, jointly signed, and filed into the court record. The jury never heard any of these stipulations.

3. The trial court abused its discretion in allowing [p]laintiff's counsel to make representations to the jurors about pre-trial offers to settle in closing arguments.

4. The trial judge erred in denying a mistrial motion that was lodged after [p]laintiff's counsel introduced argument and evidence about a gross negligence standard after this issue was precluded from being discussed by the defense.

5. The trial judge erred in giving the jury instructions on administrative procedures and allowing counsel continuously to argue and introduce evidence about civil, administrative guidelines, penalties, and procedures that run parallel to (but are not part of) tort law and procedure.

6. The quantum awarded by the jury and delivered in final judgment was excessive.

## DISCUSSION

*Gross Negligence and the Emergency Powers Act (Assignment of Error No. 1)*

In its first assignment of error, the PCF argues the trial court prevented it from asserting a gross negligence burden of proof as set forth in Louisiana Revised Statutes 29:760, *et seq.*, the Louisiana Health Emergency Powers Act ("LHEPA").

---

[3] See La. R.S. 40:1231.2(B)(1) ("[t]he total amount recoverable for all malpractices claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1231.3, shall not exceed five hundred thousand dollars plus interest and cost."); see also **Oliver v. Magnolia Clinic**, 2011-2132 (La. 3/13/12), 85 So.3d 39 (upholding the constitutionality of medical malpractice damages cap).

The PCF contends, "[b]y not applying the law as set out by the legislature and by not recognizing the gubernatorial proclamation by the governor triggering that legislation, the court violated principles of separation of powers. [...] The judge did not apply the law enacted by the other two branches of government."

La. R.S. 29:766(A) provides, "[a] state of public health emergency may be declared by executive order or proclamation of the governor, following consultation with the public health authority, if he finds a public health emergency as defined in R.S. 29:762 has occurred or the threat thereof is imminent." Pertinent herein, La. R.S. 29:762(12)(a)(iii) notes that a "public health emergency" may include an "occurrence or imminent threat of an illness or health condition that [...] [i]s believed to be caused by any of the following [...] [a] disaster, including but not limited to natural disasters such as hurricane, tornado, storm, flood, high winds, and other weather related events[.]" It is undisputed that at the time of Mrs. Simon's death, an active, continued State of Public Health Emergency, dated August 22, 2016, was in effect pursuant to an executive proclamation, which referenced LHEPA, all due to the 2016 Baton Rouge flooding events. Of note, and found within LHEPA, La. R.S. 29:771(B)(2)(c)(i) provides, "[d]uring a state of public health emergency, no health care provider shall be civilly liable for causing the death of, or injury to, any person or damage to any property except in the event of gross negligence or willful misconduct." As stated in La. R.S. 29:761(A), the purpose behind this provision, as well as the LHEPA as a whole, is:

> Because the government must do all that is reasonable and necessary to protect the health and safety of its citizens; because new and emergency dangers, including emergency and resurgent infectious diseases and incidents of civilian mass casualties, pose serious and immediate threats; because a renewed focus on the prevention, detection, management, and containment of public health emergencies is essential; and because emergency health threats, including those caused by bioterrorism, may require the exercise of extraordinary government powers and functions, the state must have the ability to respond, rapidly and effectively, to potential or actual public health emergencies.

6

In its Answer to plaintiff's Petition, the PCF did raise the affirmative defense of contributory negligence of Mrs. Simon, third-party fault, as well as failure to mitigate damages. The PCF did not specifically assert the tort immunity defense as set forth in La. R.S. 29:771(B)(2)(c)(i) in LHEPA. Additionally, plaintiff propounded written discovery to the PCF requesting support on any affirmative defense it planned to assert, yet the PCF never mentioned or discussed the gross negligence tort immunity defense. However, on September 9, 2021, two months prior to the start of trial, the PCF filed a Motion for Summary Judgment and/or Motion in Limine, citing the above LHEPA principles, and "seek[ing] to establish that the standard of care in this medical malpractice [action] is that of gross negligence only. [The PCF] seeks to prevent any argument, allusion, or statements to the jury at the trial of the merits by counsel asserting any theory or claim for recovery of mere negligence." The trial court subsequently denied the PCF's motion.

The gross negligence defense, as contained in La. R.S. 29:771(B)(2)(c)(i), is an affirmative defense that must be properly pled pursuant to Louisiana Code of Civil Procedure article 1005. See **Welch v. United Medical Healthwest-New Orleans, L.L.C.**, 2021-0684 (La. App. 5th Cir. 8/24/22), 348 So.3d 216, 221-22 ("the tort immunity provided by [La. R.S.] 22:771(B)(2)(C) of LHEPA […] is, in fact, an affirmative defense which the trial court considered properly pled, pursuant to La. [Code Civ. P.] art. 1005."). Tort immunity is an affirmative defense for which the one asserting the defense has the burden of proof. Pursuant to La. Code Civ. P. arts. 1003 and 1005, an affirmative defense should be pled in a defendant's answer. An affirmative defense raises a new matter that, assuming the allegations in the petition to be true, constitutes a defense to the action and will have the effect of defeating plaintiff's demand on its merits. The purpose of the statute requiring that certain defenses be affirmatively pled is to give fair and adequate notice of the

7

nature of the defense, preventing last minute surprise. **Aucoin v. Larpenter**, 2020-0792 (La. App. 1st Cir. 4/16/21), 324 So.3d 626, 633, <u>writ denied</u>, 2021-00688 (La. 9/27/21), 324 So.3d 87. Herein, the PCF's answer fails to affirmatively plead the tort immunity defense of gross negligence as set forth in LHEPA. Accordingly, this assignment of error lacks merit.

*Reading of Pre-Trial Stipulations to Jury (Assignment of Error No. 2)*

In its second assignment of error, the PCF contends the trial court erred in preventing it to have read aloud to the jury, or otherwise have prepared as jury instructions, nine factual stipulations agreed to between it and plaintiff, memorialized in a February 8, 2021 pre-trial order. Of note, the PCF does not claim plaintiff failed to comply with the stipulations or otherwise exceeded their scope during her presentation of evidence, but simply argues the trial court failed to allow the stipulations to be presented to the jury, either openly or through jury instructions. The nine stipulations included:

1. Mrs. Simon was a resident at Heritage [House] on January 21, 2017.

2. Since July 11, 2013, Mrs. Simon had been placed on a restricted diet of 'pureed food' only by her physician.

3. Mrs. Simon's diet restrictions was a medical order in her records at Heritage [House].

4. On January 21, 2017, Mrs. Simon was provided a meal by Heritage [House] which was not in accordance with her diet restriction.

5. Mrs. Simon died on January 21, 2017 while a resident at Heritage [House].

6. Dr. William Clark as coroner for East Baton Rouge Parish, declared Mrs. Simon's death 'natural' due to 'atherosclerotic cardiovascular disease.'

7. Following Mrs. Simon's death, the Coroner's Office obtained the records from Acadian Ambulance causing the Coroner's Office to supplement its investigative finding and led to Dr. Clark reclassifying Mrs. Simon's death as 'accidental' caused by 'choking.'

8. [Mrs.] Simon was confined to a wheelchair and unable to get in and out of bed without assistance of nursing home staff.

8

9. The diet restrictions for residents at Heritage House are placed above the resident's bed.

In clarifying *why* it is concerned with the jury being aware of the parties' pre-trial stipulations, the PCF argues, "[i]n a case involving a death, [insinuation] about the defendant not wanting to accept responsibility for the facts of the death is incredibly prejudicial." The PCF continued, claiming "Heritage House was painted as an organization that was unwilling to accept any admissions or accept any responsibility until the day of the jury trial[,]" and "[t]o offset these prejudicial comments, the PCF wanted to show the jury that the defense had – in fact – stipulated and admitted to the facts of the accident *well before* trial." (emphasis in original).

Although stipulations cannot affect the powers, duties, and prerogative of the court, generally a stipulation has the effect of a judicial admission that binds the parties and the court when it is not in derogation of the law. Pre-trial stipulations as to what evidence will be presented to the court have been enforced. **Ratliff v. State ex rel. Dept. of Transp. and Development**, 2002-0733 (La. App. 1st Cir. 3/28/03), 844 So.2d 926, 933-34, writ denied, 2003-1739 (La. 10/10/03), 855 So.2d 350. Parties are bound by their stipulations regarding factual matters. **Cotton v. Gaylord Container**, 96-1958 (La. App. 1st Cir. 3/27/97), 691 So.2d 760, 768, writ denied, 97-0800 (La. 4/8/97), 693 So.2d 147. However, as noted above, the PCF does not claim the pre-trial stipulations were violated or exceeded. Therefore, this particular assignment of error turns on trial management and the presentation of evidence, rather than any substantive evidentiary ruling by the court. In deciding whether to have the pre-trial stipulations read to the jury, the trial court stated:

All right. I don't see the need to read the stipulations to the jurors, but I note your objection. In closing arguments you – maybe that might be the appropriate time for you to argue that[.]

9

When questioned on this issue later during the trial, and upon the PCF's continued request to have the pre-trial stipulations orally read to the jury, the trial court stated:

> And I have read each and every one of them and there has been testimony supporting each and every one of those nine particular items. I see no reason now, now that I've laid eyes on this stipulation[,] as to why they need to be read out to the jury, because it came out organically and naturally by the witnesses themselves.

Louisiana Code of Civil Procedure article 1631(A) states, "[t]he court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at trial, so that justice is done." The trial court has great discretion in the manner in which proceedings are conducted before the court, and it is only upon a showing of a gross abuse of discretion that appellate courts have intervened. **Thomas v. Department of Wildlife & Fisheries**, 2018-0869 (La. App. 1st Cir. 10/2/19), 289 So.3d 579, 598, writ denied, 2019-01767 (La. 1/14/20), 291 So.3d 687. Upon our review, we cannot say the trial court abused its vast discretion in precluding the nine, purely factual, pre-trial stipulations to be recited before jury or otherwise crafted as jury instructions. As referenced above, these nine stipulations were naturally and straightforwardly discussed throughout the trial, such that repeating them again before the jury was unnecessary. Additionally, these stipulations were only to simple factual assertions, not to legal questions such as negligence, the standard of care, breach of the standard of care, or a causal connection thereto.

Moreover, as to the PCF's claim the pre-trial stipulations should be reduced to jury instructions, the jury is the trier of fact. See **Smith v. State, Dept. of Transp. & Development**, 2004-1317 (La. 3/11/05), 899 So.2d 516, 525. As such, adequate jury instructions are those which fairly and reasonably point out the issues and which provide correct *principles of law* for the jury to apply to those issues. The trial court is under no obligation to give any specific jury instructions

10

that may be submitted by either party; the judge must, however, correctly charge the jury. **Adams v. Rhodia, Inc.,** 2007-2110 (La. 5/21/08), 983 So.2d 798, 804. (emphasis added). Therefore, as the jury is the trier of fact, it would be inappropriate for the trial court to instruct the jury on factual issues. Accordingly, this assignment of error lacks merit.

*Settlement Discussions During Closing Arguments (Assignment of Error No. 3)*

In its third assignment of error, the PCF argues the trial court abused its discretion in allowing plaintiff's counsel, during closing arguments, to make representations to the jury concerning pre-trial settlement negotiations and discussions. The specific comment at issue, made by plaintiff's counsel, was:

> They came in here and they said, oh, we admit fault, and she didn't – we tried to settle this case. They want – they want you to think that Ms. Joshua is greedy (inaudible). They knew that the law won't allow me to tell you what they wanted cause they knew that you would be as hardline as I was. Just threw it out there, hey, we tried – we tried to take care of this without – without telling you what the deals were because they can't come -- .

The PCF then objected, eventually requesting a curative instruction from the trial court. However, during this quick exchange, plaintiff's counsel stated he was "done," "ready to move on[,]" and closing arguments proceeded without any further mention of pre-trial settlement offers. While the PCF frames this exchange as the trial court "overrul[ing] the objection [and giving] no curative instruction to the jury," at no time did the trial court actually indicate the objection was either overruled or sustained; it was rather not addressed due to plaintiff's counsel's implicit agreement to continue in closing arguments without further discussion of pre-trial settlement offers. Moreover, a mistrial was not requested by the PCF nor did the trial court file one on its own motion. See La. Code Civ. P. art. 1631(C).[4]

---

[4] La. Code Civ. P. art. 1631(C) states, "[t]he court on its own motion, or the motion of any party, after hearing, may grant a mistrial."

11

While the substantive introduction of evidence concerning pre-trial settlement activities is heavily regulated by Louisiana Code of Evidence articles 408 and 413, the test of whether argument of counsel is prejudicial or inflammatory is whether such comment is unreasonable or unfair in the eyes of the law. This test is balanced against the well-settled jurisprudence that counsel has great latitude in argument before a jury. This latitude is subject to regulation and control by the court who has a duty to confine argument within the proper bounds. Moreover, the trial court is vested with broad discretion in conducting trials in a manner that it determines will be conducive to justice. Further, an allegedly objectionable statement is subject to corrective measures. **Breitenbach v. Stroud,** 2006-0918 (La. App. 1st Cir. 2/9/07), 959 So.2d 926, 931. Concerning this broad discretion, as noted above, it is only upon a showing of a gross abuse of discretion that appellate courts have intervened. **Thomas,** 289 So. 3d at 598.

Here, we find no abuse of the trial court's great discretion in agreeing with plaintiff's counsel's quick decision to "move on" without any further discussion of pre-trial settlements, and without the need for any formal "ruling" on the PCF's objection. As argued by plaintiff's counsel, "the PCF got what its counsel asked for, no more mention of settlement in closing arguments[.]" Moreover, we find the PCF "opened the door" to statements regarding pre-trial settlement offers when, during voir dire, he mentioned he "cannot tell you if an offer was made. I can't tell you if one was made and what it was, and [whether the prospective jurors would] hold it against [the PCF]." We further note that the trial court properly advised the jury that its role was to "deliberate on this case without regard to sympathy, prejudice, or passion for or against any party to this suit[,]" and that it was to make "an impartial deliberation and conclusion based upon all the evidence presented in this case and nothing else." See **Jones v. Bravata,** 2018-0837 (La. App. 1st Cir.

12

5/9/19), 280 So.3d 226, 240, <u>writ denied</u>, 2019-01850 (La. 2/26/20), 294 So.3d 477. Accordingly, we find this assignment of error lacks merit.

*Motion for Mistrial re: Dr. Kamel's Video Deposition (Assignment of Error No. 4)*

In its fourth assignment of error, and in an extremely shrift argument, the PCF claims, "[d]espite prohibiting [it] from raising the gross negligence issue[,] the [c]ourt allowed the [p]laintiff to put on evidence from their independently retained expert, Dr. Kamel, about gross negligence." The PCF continued, claiming, "[n]ormally, a [p]laintiff putting on evidence of some sort can simply be cured during the time allotted for a defense to offer its own evidence. Here, though, the [p]laintiff was introducing evidence of gross negligence against the defense, while the PCF's hands were tied behind its back by the court on the gross negligence issue [and] unable to respond."

The record reflects that during trial, plaintiff offered the video deposition of Dr. Hosan Kamel ("Dr. Kamel"), an expert retained by plaintiff in the field of geriatrics and long-term care. Prior to playing the deposition recording for the jury, which was taken five days before trial, counsel for the PCF initially sought to waive all the questions he asked during Dr. Kamel's deposition and have the jury not hear those exchanges. Plaintiff's counsel refused to agree, and the trial court overruled the PCF's request. The PCF's counsel did specifically preserve his objection to his "questioning going in against my wishes[.]" This, however, was not assigned as error on appeal.

The entire video deposition of Dr. Kamel was played for the jury. However, *after* the video deposition was played, and *after* the jury was retired for the evening, counsel for the PCF objected to and claimed a mistrial regarding Dr. Kamel's deposition, stating, "[t]here was much testimony [from] the doctor about gross negligence, an issue addressed by this court. Ruled away by this court, his deposition was taken after that ruling. He had plenty of time to meet with and

13

confer with that expert." Counsel for the PCF continued, "[w]e're not allowed to talk about gross negligence, we are not entitled to respon[d], and certainly too late. You can't un-ring the bell and we can't – we can't do anything about it at this point[.]" Following additional brief argument from counsel, the trial court denied the PCF's request for a mistrial.

In order to preserve an evidentiary issue for appellate review, it is essential that the complaining party enter a contemporaneous objection to the evidence and state the reasons for the objection. The failure to make a contemporaneous objection during the trial waives the right of a party to complain on appeal that the evidence was improperly admitted at trial. **Louisiana State Bar Ass'n v. Carr and Associates, Inc.**, 2008-2114 (La. App. 1st Cir. 5/8/09), 15 So.3d 158, 172, writ denied, 2009-1627 (La. 10/30/09), 21 So.3d 292. Here, the record is clear: the PCF did not contemporaneously object to Dr. Kamel's testimony, or any statements regarding a gross negligence standard, during the time the recording was played for the jury. Moreover, in Dr. Kamel's deposition, taken less than one week before trial, counsel for the PCF did not object to Dr. Kamel's opinions regarding the gross negligence burden of proof; rather, he continued to question Dr. Kamel on this issue. As such, any appellate review on this particular issue is waived.

Additionally, as to the PCF's claim that a mistrial should be granted due to the insinuation that plaintiff's counsel conspired with Dr. Kamel to have him mention gross negligence during the deposition, we find this lacks merit. Although La. Code Civ. P. art. 1631(C) allows the trial court to grant a mistrial, the trial court is vested with broad discretion to grant a motion for mistrial where no other remedy would afford relief or where circumstances indicate that justice may not be done if the trial continues. **Barnes v. Thames**, 578 So.2d 1155, 1161 (La. App. 1st Cir.), writs denied, 577 So.2d 1009 (La. 1991). We find that the trial court did

14

not abuse its broad discretion in denying the PCF's motion and, accordingly, find this assignment of error lacks merit.

*Jury Instructions re: Administrative Guidelines (Assignment of Error No. 5)*

In its fifth assignment of error, the PCF argues that a portion of the jury instructions read by the trial court concerned "arcane" administrative guidelines and procedures, allegedly unrelated and "irrelevant" to the underlying issues of medical malpractice. Specifically, the PCF claims the trial court erroneously provided jury instructions regarding federal, state, and local administrative guidelines concerning nursing home residents' treatment rights while at the home. This included such specific instructions concerning appropriate fluid intake. It also addressed nursing home staffing criteria and quotas along with requirements for written procedures concerning reporting and documentation of various types of incidents at a nursing home, as well as the exact types of information to be included in such reports. In light of the previously discussed failure by Heritage House to timely report Mrs. Simon's death to the appropriate regulatory authorities, as well as the assessed civil penalty, the PCF argues that "[r]e-introducing this law and argument to the jury served no valid purpose other than to incentivize the jury to re-punish and re-award for those administrative violations. This was improper, and it naturally led the jurors' minds to want to punish Heritage House for violating administrative requirements rather than award fair compensation to [plaintiff][.]" On the final day of trial, prior to closing arguments, the PCF noted its objection to this particular section of the trial court's jury instructions.

The trial court is required to instruct the jurors on the law applicable to the case submitted to them. See La. Code Civ. P. arts. 1792(A) and 1796(B). The trial court is responsible for reducing the possibility of confusing the jury and may exercise the right to decide what law is applicable and what law the trial court

15

deems inappropriate. The sufficiency of a jury charge must be determined in light of the charge as a whole. The charge must correctly state the law and be based on evidence adduced at trial. **LeBlanc v. Landry**, 2008-1643 (La. App. 1st Cir. 6/24/09), 21 So.3d 353, 358, <u>writ denied</u>, 2009-1705 (La. 10/2/09), 18 So.3d 117 (citations omitted). Adequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues. The trial court is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. **Adams**, 983 So.2d at 804.

It is well established in Louisiana jurisprudence that an appellate court must exercise great restraint before it reverses a jury verdict due to erroneous jury instructions. Trial courts are given broad discretion in formulating jury instructions, and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part, on respect for the jury determination rendered by citizens chosen from the community who serve a valuable role in the judicial system. We assume a jury will not disregard its sworn duty and be improperly motivated. We assume a jury will render a decision based on the evidence and the totality of the instructions provided by the judge. **Id.**

However, when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if the charges adequately provided the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its deliberation. Ultimately, the determinative question is

16

whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. **Id**.

Based on our review, the record is full of references and discussion on how nursing homes are regulated by state and federal law. During trial, Frank Pennington, former Director of Nursing at Heritage House, testified concerning the applicable regulations, both internally and externally mandated, many of which address patient care and safety. Also, Page McClean, a witness specifically called on by the PCF, and who is the administrator at Heritage House, testified extensively regarding the various state reporting requirements involving incidents and deaths which occur at a nursing home facility. In fact, printouts of the various statutes from the Federal Register, which address and regulate nursing homes and incidents which occur therein, were introduced into the evidentiary record. Moreover, Denisa Joshua ("Ms. Joshua"), Mrs. Simon's daughter, testified that Heritage House's refusal to properly report and inform her of the death of her mother caused continual feelings of pain and betrayal. However, despite this evidence being presented to the jury, the PCF now argues, "Heritage House [was painted] as a rule-breaking entity[.]" We must note, however, that it is undisputed Heritage House personnel neither followed appropriate state and federal reporting and compliance requirements following Mrs. Simon's death, nor their own internal investigation procedures.

Upon our review, we find the trial court did not provide the incorrect substance of the law in instructing the jury regarding compliance and reporting requirements for nursing homes, and we further find it was a natural inclusion in the jury instructions on the part of the trial court. Therefore, and based on the broad discretion afforded to a trial court in formulating jury instructions, we determine this assignment of error lacks merit.

In its last assignment of error, the PCF contends the quantum award for plaintiffs' wrongful death and survival action claims is excessive. As to plaintiffs' survival action claim, the PCF argues, "[t]he evidence was clear and convincing that [Mrs.] Simon could under no circumstances [have] been consciously suffering beyond thirteen minutes, which the video record notes indicate was the time that elapsed between Nurse Hoffman entering the room and delivering the mixed-up snacks until when she returned and found [Mrs.] Simon unresponsive." The PCF continues, noting testimony from Dr. William Clark, who opined that after eating the sandwich which restricted her airflow, Mrs. Simon would have remained conscious for two to four minutes. As such, the PCF argues, "[t]wo to four minutes of possibly conscious suffering does not support a $250,000.00 survival action award." Further, as to plaintiff's wrongful death claim, the PCF claims, "[plaintiff] was not receiving any support or services from her mother, [Mrs.] Simon. To the contrary, [Mrs.] Simon was, if anything, supported by [plaintiff]. There were no medical expenses. The only element recoverable under the facts of the case was loss of love and affection, and there it was questionable at best as to how much time [plaintiff] actually spent with her mother in the nursing home." The PCF concludes, "[an] award of $500,000.00 was excessive for a 62-year-old daughter who[,] by own admission[,] did not visit her mother 'a lot[.]'"

At the conclusion of trial, the jury returned a damage award of $250,000.00 for plaintiff's survival action claim and $500,000.00 for plaintiff's wrongful death claim. These awards were reduced to one amount of $400,000.00 in the trial court's December 3, 2021 judgment, in accordance with the medical malpractice damages cap. See La. R.S. 40:1231.2(B)(1).

Although both actions arise from common tort, survival and wrongful death actions are separate and distinct. The survival action comes into existence

18

simultaneously with the existence of the tort and is transmitted to beneficiaries upon the victim's death. The survival action permits recovery only for the damages suffered by the victim from the time of injury to the moment of death. It is in the nature of a succession right. On the other hand, the wrongful death action does not arise until the victim dies, and it compensates the beneficiaries for their own injuries, which they suffer from the moment of the victim's death and thereafter. La. Civ. Code arts. 2315.1 and 2315.2; **White v. Entergy Gulf States Louisiana, L.L.C.**, 2013-1608 (La. App. 1st Cir. 11/10/14), 167 So.3d 764, 769, writ denied, 2015-0478 (La. 5/15/15), 170 So.3d 163, *citing*, **McGee v. A C And S, Inc.**, 2005-1036 (La. 7/10/06), 933 So.2d 770, 779-80. In addition, a wrongful death claim is like a loss of consortium claim insofar as it clearly compensates the beneficiaries for their own injuries, separate and distinct from the primary victim's injuries. **Id**.

It is well settled that a judge or jury is given great discretion in its assessment of quantum, of both general and special damages. See La. Civ. Code art. 2324.1. Due to the innate inexactitude of general damages in particular, the role of the appellate court in reviewing these awards is limited. The court should not decide what it believes is an appropriate award, but rather should review the discretion of the trier of fact in accordance with the circumstances of the case. **Travis v. Spitale's Bar, Inc.**, 2012-1366 (La. App. 1st Cir. 8/14/13), 122 So.3d 1118, 1131, writs denied, 2013-2409 & 2013-2447, (La. 1/10/14), 130 So.3d 327, 329, *citing*, **Youn v. Maritime Overseas Corp.**, 623 So.2d 1257, 1260-61 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The discretion vested in the trier of fact to set general damage amounts is "great, and even vast," so an appellate court should rarely change such awards. **Travis**, 122 So.3d at 1131. Only if an award is beyond what any reasonable person could have assessed for the injury suffered in light of the evidence may an appellate court

19

disturb a jury award for general damages. In addition, only after determining that the fact finder abused its great discretion may an appellate court consider awards in similar cases, and even then may only do so for the purpose of determining the highest or lowest figures within the fact finder's discretion. **Id.** at 1131-32, *citing,* **Howard v. Union Carbide Corp.**, 2009-2750 (La. 10/19/10), 50 So.3d 1251, 1256 (per curiam).

Concerning plaintiff's survival action claim, and describing Mrs. Simon's choking death, Dr. Kamel testified:

> [W]hen you choke and there is no air, there is a state of panic, there's a state of anxiety, you completely not – I mean, you want to scream and now here the problem you cannot even scream because you don't have a voice. You keep continuing coughing and the sad thing that this can continue up to ten minutes like – like for ten minutes you are struggling and trying to get air in and you're not able to ask for help and she had the curtains around her. And, of course, it will get blue and then you become unconscious and then you will die.

Dr. Kamel further explained that "your respiratory system fails and then your heart fails. So, I mean, usually sometimes you say cardiac, it starts with the heart, and you stop breathing. Here the heart would stop breathing and your brain because there's oxygen coming, but until this happens, *you are really, really suffering and that's a horrible death.*" (emphasis added). Dr. William Clark testified much the same as Dr. Kamel, confirming how a choking victim "doesn't know what's going on[,]" there is physical pain associated with the choking, along with anxiety and fear when the individual begins to realize they may not live. Moreover, and in addition to the physical description of choking as stated by Dr. Kamel and Dr. William Clark, in the sole statement provided by Mrs. Simon's roommate, on the night of the fatal accident, following Hoffman's distribution of the evening snacks, Mrs. Simon's roommate stated she "heard [Mrs. Simon] coughing and a noise that sounded like she fell[.]"

While the PCF relies on this court's decision in **Maldonado v. Kiewit Louisiana Co.**, 2012-1868 (La. App. 1st Cir. 5/30/14), 152 So.3d 909, 936, writ denied, 2014-2246 (La. 1/16/15), 157 So.3d 1129, for the argument that damages are not appropriate in a survival action "[w]here there is no indication that a decedent consciously suffered," it overlooks the prevailing principle that "[s]urvival damages are properly awarded if there is even a scintilla of evidence of pain or suffering on the part of the decedent, and fright, fear, or mental anguish during an ordeal leading to the death is compensable." **Id**. The PCF attempts to argue that both Mrs. Simon did not consciously suffer and, conversely, that she only suffered for two to four minutes. Regardless, the jury's award of survival action damages to plaintiff indicates it found "a scintilla of evidence" that Mrs. Simon did consciously and horrifically suffer in the up to thirteen minutes between being fed the sandwich and her ultimate death.

As to plaintiffs' wrongful death claim, the PCF advances a shrift argument, stating "[t]he evidence in the medical records showed that Ms. Simon was visited by some family member two times a year (although Ms. Joshua denied this at trial) – notwithstanding Ms. Joshua's denial, the fact is that Ms. Simon was in a nursing home with a questionable level of family visitation and support." However, a mere cursory review of the testimony presented at trial refutes these assertions.

Ms. Joshua, Mrs. Simon's daughter, testified that, due to Mrs. Simon's mental illnesses, she developed a unique relationship with her mother from a very early age, taking on both the responsibilities of Mrs. Simon's physical care and needs, as well as household tasks for herself and siblings. Ms. Joshua later moved to California, but testified she called and visited her mother when she could, which made her "happy and glad." Later, Ms. Joshua moved back to Baton Rouge and, in 2002, moved her mother to Heritage House. While at Heritage House, Ms. Joshua testified she would often visit her mother, bringing various treats and items Mrs.

21

Simon enjoyed, as well as help with Mrs. Simon's laundry. Further, due to Mrs. Simon's mental illness, Ms. Joshua testified it was not uncommon for the Heritage House personnel to call her in order to assist them in helping Mrs. Simon through any particularly difficult moments of the day. Ms. Joshua testified how she played games with Mrs. Simon, watched television with her, sat outside, would take her to restaurants away from Heritage House, and generally spent time together. Ms. Joshua understood the mental challenges faced by Mrs. Simon, but nevertheless continued to help, visit, and do what she could to make her mother happy. Also, other individuals and family friends recognized Ms. Joshua and Mrs. Simon's relationship, noting that "[Ms. Joshua] took care of her mother [be]cause her mother had those mental issue[s], so she had to make decisions for her." Unfortunately, staff at Heritage House did not disclose to Ms. Joshua the accurate reasons of her mother's death. Nearly three weeks after Mrs. Simon's memorial service, Ms. Joshua received an anonymous call informing her of the true cause of Mrs. Simon's death, to which she stated:

> I felt angry, felt sad, and felt betrayed. It wasn't like I didn't have a relationship with – with the staff at Heritage House. That wasn't the case at all. I did not bring my mother there for a hospice situation. I brought my mom there for quality of life; and she had that, she had that there. I felt betrayed all of the times that they told me how much that they care for her, and I don't doubt that they did, I'm not her[e] to say that they didn't. I just couldn't believe that they misled me and nobody, even when I went to the office [to gather Mrs. Simon's personal items], [...] [n]obody said anything to me. Even the people who I invited to speak on her behalf. I just – I just couldn't believe that they thought that little of me and her.

Ms. Joshua continued:

> I'm not trying to be a champion for anybody, but certainly I don't want anybody to have to relive the pains of going through what they would have to go through and finding of their love[d] one. When I heard that my mother passed it was – I went through grieving and I just kept saying when am I going to come out of this. I felt like I was walking in a fog. But when I had that call, it almost took me back to day one. This is different and its new, and its grief on top of betrayal.

Therefore, we find the jury did not abuse its vast discretion in awarding $250,000.00 in damages for plaintiff's survival action claim and $500,000.00 in damages for plaintiff's wrongful death claim. The testimony presented at trial reflects Mrs. Simon suffered a tragic death, consciously suffering for a period of time, up to her death thirteen minutes after being fed the sandwich. Additionally, Ms. Joshua testified regarding the loving relationship she had with her mother, and how she felt betrayed by Heritage House's refusal to provide her with the truth concerning Mrs. Simon's death. However, the amounts initially awarded by the jury were nevertheless reduced to one award of $400,000.00. Accordingly, the PCF, due to the medical malpractice damages cap, has inherently already received an automatic reduction of the jury's award. Therefore, we cannot say such an award is excessive in light of the circumstances surrounding Mrs. Simon's death and the relationship Ms. Joshua had with her mother. This assignment of error lacks merit.

## CONCLUSION

For the above reasons, the trial court's December 3, 2021 judgment is affirmed. Costs of this appeal are assessed against defendants/appellants, the Louisiana Patient's Compensation Fund and Louisiana Patient's Compensation Fund Oversight Board.

**AFFIRMED.**